USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/21/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARY McPARTLAN-HURSON,

                                    Plaintiffs

        v.

WESTCHESTER COMMUNITY COLLEGE, and
WESTCHESTER COUNTY,

                                    Defendants.

13-CV-2467 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Mary J. McPartlan-Hurson ("Plaintiff") commenced this action against Defendants Westchester Community College ("WCC") and Westchester County (the "County") (collectively "Defendants") by filing a summons and complaint with this Court on April 12, 2013. (*See* ECF No. 1 (the "Complaint" or "Compl.").) Plaintiff's Complaint asserts causes of action grounded in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* (the "ADA"). Plaintiff alleges that WCC discriminated against her on the basis of her race and disability when they denied her a diversity fellowship for the Fall 2009 semester and subsequently terminated her in December of 2009, and claims that her termination also amounted to retaliation. Presently before the Court is the Defendants' motion for summary judgment on the issue of exhaustion and on the merits of each claim ("Defendants' Motion"). (*See* Defendants Brief in Support of their motion for summary judgment ("Defs. Br.") (ECF No. 143).) For the following reasons, Defendants' Motion is GRANTED in part and DENIED in part.

# FACTUAL BACKGROUND[1]

Plaintiff, Mary McPartlan-Hurson, a Caucasian, disabled[2] woman, was hired as an adjunct professor in the English Department at WCC in 2004. (*See* Plf. Resp. ¶1.) Her position as an adjunct was terminated in December of 2009, after being denied a diversity fellowship for the Fall 2009 semester and reapplying for the fellowship again in October 2009 for the Spring 2010 semester. (*Id.* ¶95.)

## I. The Charges Before the EEOC

On July 19, 2010, Plaintiff filed her first charge with the Equal Employment Opportunity Commission ("EEOC") for disability discrimination and retaliation in violation of Title VII and the ADA (the "Initial Charge"). (Defs. 56.1, Ex. AA.) In support of her Initial Charge, Plaintiff completed an EEOC Intake Questionnaire in which she complained that she was discriminated against when she was denied a diversity fellowship by WCC, which was instead awarded to recipients that were African American and not disabled. (*See* Sapri Decl., Ex. 37.) Plaintiff filed a second charge with the EEOC on March 25, 2011 to explicitly include a claim for racial discrimination, in addition to her disability discrimination and retaliation claims (the "Second Charge"). (*See* Plf. Resp. ¶96; Defs. 56.1, Ex. BB.) Plaintiff's Second Charge was entitled an "Amended Charge" and given the same charge number as the Initial Charge. (*Compare* Defs. 56.1, Ex. AA *with* Ex. BB.) On July 20, 2012, the EEOC issued a determination and a finding of

---

[1] The facts are drawn from the Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Defs. 56.1") (ECF No. 151), Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("Plf. Resp.") (ECF No. 144), Defendants' Counter Response to Plaintiff's 56.1 Statement ("Defs. Cntr.") (ECF No. 152), and the exhibits attached thereto. They are undisputed except where indicated. Any citations made to documents and testimony provided by Plaintiff will be to those exhibits attached to the Declaration of Donald L. Sapir in Opposition to Defendants' Motion ("Sapir Decl.") (ECF No. 145). References made to documents provided by Defendants will be to the exhibits as attached to their Rule 56.1 Statement.

[2] There appears to be no dispute that Plaintiff is disabled, so the Court need not discuss the specifics of her disability.

probable cause (the "July 20th Determination") that Defendants had discriminated against her on the basis of race but not disability. (*See* Sapir Decl., Ex. 39.)

Prior to issuing its July 20th Determination, the EEOC requested that Defendants provide evidence supporting their reasons for denying Plaintiff the diversity fellowship and terminating her. (*Id.*) Defendants provided no such documents. (*Id.*)

## II.     Plaintiff's Employ at WCC

Plaintiff was an adjunct for WCC for approximately 11 semesters. During her employ, Plaintiff taught two-to-three classes per semester in the English Department. (*See* Plf. Resp. ¶¶2, 5, 15; Defs. Cntr. ¶144.) In the Spring of 2006, Plaintiff applied for a full-time position. (*See* Defs. 56.1, Ex. A, at 60.) She enlisted the help of Maryanne Vent, the English Department's Adjunct Coordinator ("Vent"), to assist in her application. Vent supported Plaintiff's candidacy by writing a letter of recommendation (the "2006 Recommendation"). (Sapir Decl., Ex. 13.) Ultimately, Plaintiff was not chosen for a full-time position. (*See* Plf. Resp. ¶8.) In 2007, Plaintiff again applied for a full-time position, but her application was denied. (*See* Plf. Resp. ¶9.)

During the Spring 2008 semester, Michael Downie, a male African American English professor, was denied tenure and terminated. (*See* Defs. Cntr. 1.) After his termination, Mr. Downie initiated a Title VII lawsuit against the school alleging that he was terminated due to race discrimination. (*Id.* ¶106.) Ultimately, the case was resolved by way of a settlement, (*see* Plf. Resp. ¶21), but there remained tension and unrest on campus, (Defs. Cntr. ¶109.) In the wake of Mr. Downie's firing and resulting lawsuit, the teachers in the English Department were fighting over whether his termination was merit-based or racially motivated. (*See* Defs. Cntr. ¶110.)

In approximately Spring of 2008, shortly after Mr. Downie was denied tenure, Cynthia Robinson, an African American English adjunct, was hired for a full-time position. (Defs. Cntr.

¶102.)  To promote her to this position, a "special line" was created by Frank Madden, Chairman

of the English Department and Joseph Hankin, WCC's president, whereby she was hired outside

"the usual channels" as an "affirmative action hire."  (*Id.*)  Upon learning this information,

Plaintiff, who had a cordial relationship with Vent insofar as they would speak over the telephone

outside of work, (*see* Sapir Decl., Ex. 2 at 46-47; Defs. 56.1, Ex. 5), testified that she called Vent

to relay her happiness that WCC was "doing the right thing" by promoting an adjunct to a full time

position, (*see* Sapir Decl., Ex. 1 at 116.)  During that conversation, Plaintiff contends she asked

why Robinson was promoted when she was not and Vent replied that "she's got something you

don't have . . . . she's black."  (*Id.* at 116-17; *see also* Plf. Resp. ¶34.)  Defendants contend that

this conversation happened in the inverse; that Plaintiff claimed Robinson had only been promoted

"because she was black."  (Defs. Cntr. ¶103, Ex. G at 59.)

In an effort to increase diversity among the faculty, WCC administrators created the Dr.

Julius Ford Teaching Fellowship Program (the "Fellowship") in 2009.  (*See* Plf. Resp. ¶¶49-50.)

The Fellowship was available to diverse adjunct professors who were interested in obtaining full-

time positions at the school, (*id.* ¶¶50-51; Defs. Cntr. ¶114), and was "designed to assist

individuals, in particular from underrepresented groups," (*see* Sapir Decl., Ex. 19.)

On January 23, 2009, Plaintiff contacted Vent to discuss her interest in applying for the

Fellowship.[3]  (Defs. 56.1, Ex. K.)  In response, Vent noted her interest in Plaintiff's application

and becoming involved in the committee.  (*Id.*)  In January of 2009, Plaintiff submitted an

application for the Fall '09 Fellowship and Vent authorized Plaintiff to use the 2006

---

[3] Plaintiff also contends that she spoke with Vent about the Fellowship over the phone and Vent told Plaintiff that she would only be considered if all of her "freckles have melded since [she] saw [Plaintiff] last."  (Defs. Cntr. ¶119.) Defendants dispute that Vent ever made such comments and contest the admissibility of such testimony.  (*Id.*)  As explained in further detail below, in light of Plaintiff's inability to file her EEOC charges within 300 days of her non-receipt of her Fellowship, the Court may only consider evidence relevant to such denial as background information. Thus, the dispute between Plaintiff and Defendants' versions of what was said in this conversation is not material.

Recommendation in support thereof.  (*See* Sapir Decl., Ex. 1 at 237, 274; Ex. 2 at 192-93; Ex. 21.)

In March of 2009, Plaintiff was interviewed as part of the application process.  (Defs. Cntr. ¶122.)

The Co-directors of the Fellowship, Melissa Acevedo ("Acevedo") and Donald Whitely

("Whitely") believed Plaintiff's application to be strong.  (*Id.* ¶123.)

On April 8, 2009, Acevedo emailed certain division heads and department chairs regarding

candidates for the Fall '09 Fellowship.  (Plf. 56.1 ¶57; Defs. Cntr. ¶120.)  Her email detailed a list

of five adjunct professors who were being recommended as fellows including two adjuncts from

the English Department, one of whom was Plaintiff.  (Plf. 56.1 ¶58; *see also* Sapir Decl., Ex. 22.)

Acevedo asked the department chairs and division heads to comment on the adjuncts' candidacies,

in particular "whether or not [they felt] that the candidate should be selected to participate in the

program."  (Plf. 56.1 ¶57; *see also* Sapir Decl., Ex. 22.)  Jianping Wang[4] forwarded Acevedo's

request to the following members of the English Department, asking for their input: Madden,

Heather Ostman (Assistant Chair), and Vent.  (*Id.*)

Vent and Ostman responded to the requests for comment the very same day.  (Plf. 56.1

¶¶59-61.)  Madden did not provide his comments on the subject.  (*Id.* ¶62; Defs. Cntr. 124.)  Vent's

response recommended Plaintiff for the Fellowship, by noting that Plaintiff was an effective

teacher of basic writing and:

> provides students with structure, basic skills, and a great deal of practice
> writing. This means a great deal of work for her, but she does what is best
> for students. As a disable person, she is a good role model for her classes.
> That fact, along with her work ethic, makes her a strong candidate for the
> fellowship.

---

[4] Jianping Wang is the Associate Dean of Academic Affairs for Arts and Humanities.

(Sapir Decl., Ex. 23.) Ostman, on the other hand, equivocated on Plaintiff's candidacy. (Plf. 56.1 ¶¶60-61.) Specifically, Ostman wrote, "I think there are reasons to support [Plaintiff] and reasons not to support her." (*See* Sapir Decl., Ex. 24.) She continued:

> [o]n the one hand, she is very present to the college and very much wants to work here. On the other, my communication with her suggests she may be one of the most unforgiving teachers I have ever met. She often suggests that our students are quite incapable, an attitude that can often create a self-fulfilling prophecy in the classroom. Since the Fellowship program's intent is to prepare their fellows for possible full time employment, I have reservations about [Plaintiff]. On the other hand, she may well benefit from a mentor.

(*Id.*) Though Madden did not respond to Wang's email for comment, he testified that he initially agreed with Vent. (*See* Defs. Cntr. ¶124, Ex. II at 230-31.) His opinion on the subject later changed as he, Vent, and Ostman met to discuss Plaintiff in "a very evaluative way." (*Id.*)

On April 9, 2009, Acevedo sent another email to members of the Fellowship Committee; Chet Rogalski (former Vice President and Dean of Academic affairs), Whitely, and Vernon Huff.[5] (*See* Defs. 56.1, Ex. N.) The email listed five fellows "that ha[d] received departmental approval" for the Fall '09 Fellowship; Plaintiff was no longer on the list,[6] (*id.*), and was not selected to receive the Fall '09 Fellowship, (Plf. Resp. ¶67; Defs. 56.1, Ex. R.)

Plaintiff received her rejection in May of 2009. (Sapir Decl., Ex. 1 at 254-55.) Shortly thereafter, she was walking to Ostman's office to discuss a grade change for one of her students and ran into Whitely. (*Id.*) She testified that Whitely informed her that she had actually been chosen for the Fall '09 Fellowship but that her "department or the administration had pulled [her] name." (*Id.*) Plaintiff then went to Ostman's office and relayed her conversation with Whitely,

---

[5] Neither party identified Mr. Huff's position at WCC outside of identifying him as a Fellowship committee member.
[6] Plaintiff was not the only person removed from Acevedo's April 8, 2009 list. Two other candidates that were listed in Acevedo's April 8, 2009 email were replaced with two new candidates in the April 9, 2009 email. (*Compare* Sapir Decl., Ex. 22 *with* Defs. 56.1, Ex. N.)

and Ostman said that all she knew was that Wang had asked her to recommend "two people of color . . . for the fellowship." (*Id.* at 254.) Plaintiff contends that this caused her to reassess the reason she was rejected for the Fellowship. (*Id.* at 254-55.)[7]

After obtaining this information from Ostman, Plaintiff called Vent and relayed her conversations with Whitely and Ostman. (Defs. Cntr. ¶169.) During that conversation, Plaintiff complained to Vent that she believed she was denied the Fall '09 Fellowship because she was disabled and not a person of color. (*Id.*; Sapir Decl., Ex. 1 at 316.) When asked whether she recalled Plaintiff having that conversation with her, Vent stated that it "sounds like something [Plaintiff] might have said, but I don't recall that." (*See* Sapir Decl., Ex. 2 at 312.)

Though she did not receive the Fall '09 Fellowship, Plaintiff applied for the Spring 2010 Fellowship. (Defs. Cntr. ¶¶131-32.) To be considered for the Spring '10 Fellowship, candidates had to have departmental approval and be scheduled to teach in the Spring. (Defs. Cntr. ¶128.) On October 29, 2009, Plaintiff emailed Vent, Madden, and Ostman informing them that she had left a copy of her Spring '10 application at each of their offices and requested that they give her department approval for the Fellowship. (*See* Sapir Decl., Ex. 30.) Ostman then removed Plaintiff from the email chain and wrote directly to Vent and Madden suggesting that they "talk about this together before" responding. (*Id.*) In response, Vent wrote "I don't want to sabotage her application, but I'm getting a little tired of this after hearing her story over and over." (*Id.*)

---

[7] Defendants contest that these conversations with Ostman or Whitely ever happened, because both Ostman and Whitely testified that they were unable to recollect such conversations. (*See* Defs. Cntr. ¶¶168-69.) Such a dispute is not material. Moreover, the Court is permitted to consider the statements allegedly made by Whitely and Ostman, as the statements are party-opponent admissions and thus admissible under Federal Rule of Evidence 801(d)(2)(D). *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 79 (2d Cir. 2016). It is uncontested that Ostman and Whitely were employees of WCC at the time they made the statements, and the statements clearly related to "a matter within the scope of the agency", as they pertained to Plaintiff's candidacy for a fellowship established by the school, of which Whitely was a committee member, and on which Ostman's input was elicited. *See id.* (admitting statements of NYCHA employee because the statements were made by a declarant that was "an advisory or other significant participant in the decision-making process that is the subject matter of the statement").

### III.    Plaintiff's Termination and the Reasoning Therefor

Vent, Madden, and Ostman all testified that the decision to fire Plaintiff resulted from a series of student and colleague complaints that they discussed in a meeting during the Fall 2009 semester.  (*See* Plf. Resp. ¶75; *see also* Sapir Decl., Ex. 2 at 103.)

According to Vent, during the Spring 2009 semester, Plaintiff was not an effective teacher of basic writing and did not do what was best for her students.  (*See* Plf. Resp. ¶¶79-80.)[8] Moreover, Vent claimed that she had heard multiple student complaints regarding Plaintiff's personality and behavior, though she admitted that she had never received such complaints personally; they were all received by Madden and relayed to her.  (*See* Sapir Decl., Ex. 2 at 94, 134.)  These complaints had been ongoing "every semester for three or four semesters" prior to their decision not to rehire Plaintiff.  (*Id.* at 134.)  Though Vent originally found Plaintiff to be "congenial and pleasant," by the time she made the decision to terminate her, she "found her to be more abrasive . . . harping on who got a job, who didn't; harping on conspiracies about who's trying to keep her from getting this fellowship."  (*Id.* at 212; Defs. Cntr. ¶170.)

Madden testified specifically about two student complaints that he had received.  (*See* Sapir Decl., Ex. 3 at 36.)  The remaining complaints were general and received from third parties.  (*Id.*) Madden also testified that whenever he received student complaints, he followed a regimented approach to resolving them, the first step of which was to ask the students to address their concerns with the professor directly.  (*See id.* at 15-18.)  If the particular student did not return to complain further, he considered the dispute resolved.  (*Id.* at 16.)  In both instances where students complained about Plaintiff, Madden could not recall writing to her regarding the complaints (*id.*

---

[8] Defendants cite to page 274 of Vent's deposition as support for these statements.  (*See* Plf. Resp. ¶¶79-80.)  Though neither party has provided the Court with this page of Vent's deposition, the Court may still consider it, as Plaintiff has not disputed that Vent did in fact testify as such.  (*Id.*)

at 19-20), and assumed the disputes were resolved when he had not heard from the students again after sending them to speak with Plaintiff directly, (*id.* at 30, 33.) Despite Vent's testimony to the contrary, Madden testified that Vent had discussed student complaints with him that she had personally received. (*Id.* at 37.)

Ostman testified that she had received complaints that Plaintiff was excessively talkative, though she admitted that she had never witnessed such behavior for herself. (Plf. Resp. ¶¶22-23.) She also claimed not to be surprised when she heard about student complaints because she knew Plaintiff to be abrasive, though she "sort or assumed it[ was] . . . a Bronx thing." (*See* Sapir Decl., Ex. 4 at 30.) Ostman further testified that Madden expressed reluctance to rehiring Plaintiff for the Spring 2010 semester because her performance was a "problem that [they] were trying to head off" insofar as she had a number of "little things", such as her personality and student complaints, that became difficult. (*Id.* at 62, 65.)

Toward the end of 2009, Vent, Ostman, and Madden had a meeting to discuss whether to rehire Plaintiff for the Spring 2010 semester, in light of the above referenced student and colleague complaints. (Plf. Resp. ¶¶ 75-80.) Following that meeting, Vent made a decision to terminate Plaintiff which resulted from a "history of problems", (*see* Defs. 56.1, Ex. X), ultimately leading Vent to the conclusion that Plaintiff "was just too much of a liability and [she] made the final decision not to rehire her," (*see* Defs. Br. at 3 n.2; Plf. Resp. ¶¶75-82.) In December of 2009, this decision was communicated to Plaintiff. (Defs. Cntr. ¶135; Plf. Resp. ¶84.) Specifically, Plaintiff received a call from Vent on December 17, 2009 informing her that WCC had no classes for her to teach in the Spring of 2010. (Defs. Cntr. ¶135.)[9] On December 19, 2009, Plaintiff sent an email

---

[9] Defendants dispute Plaintiff's contention that she was informed of her termination by Vent on December 17, 2009, (*see* Defs. Cntr. ¶135), but then use Plaintiff's email to Whitely recounting this conversation in an effort to argue that Plaintiff was fired on December 17, 2009, (*see* Defs. Br. at 8.) Defendants' objection to this testimony is baseless; Plaintiff's version is uncontested, Defendants cite to Plaintiff's own statements to argue that she was fired on

to Whitely stating that she had "received [her] answer . . . [regarding her Spring '10 application] in the form of a phone call . . . informing [her] that not only was [she] not getting the Fellowship but [she] was, in fact, fired."[10]  (Defs. 56.1, Ex. U.)

Despite having already been informed that she would not be rehired for the Spring 2010 semester, Plaintiff contacted Wang to inquire into the status of her Spring '10 Fellowship application.  (*See* Defs. 56.1, Ex. V.)  Also included on this email were Acevedo, Rogalski, Vent, Ostman, Madden, Whitely, and Hankin.  (*Id.*)  Thereafter, Rogalski contacted Vent, Madden, and Ostman to ascertain whether they intended to rehire Plaintiff for the Spring 2010 semester, so the Fellowship committee could consider her application.  (*See* Defs. 56.1, Ex. X.)  Madden responded on December 21, 2009 by informing Rogalski that Plaintiff had a history of problems, was "hostile", and that the English department had "believed it best to cut [its] ties now."  (*Id.*)  Vent agreed that Madden's description of Plaintiff was accurate.  (*See* Defs. 56.1, Ex. X.)

Defendants now argue that no material facts exist on any of Plaintiff's claims, warranting summary judgment in their favor on each cause of action.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes

---

December 17, 2009, and Defendants otherwise provide no alternate explanation demonstrating who informed Plaintiff of her termination or how it was communicated to her.

[10] Plaintiff repeatedly contends that Vent informed her that the decision not to rehire her was not final, (*see e.g.* Plf. Br. at 17), despite sending the December 19, 2009 email explicitly stating that she was fired.  This is not material, as Plaintiff ultimately agrees that she was terminated in December of 2009.

demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record.  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility.  *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).  Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial."  *Anderson*, 477 U.S. at 250.  Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice.  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## DISCUSSION

### I.     Title VII Exhaustion

Defendants first argue that Plaintiff failed to timely exhaust her claims.  (*See* Defendants' Brief in Support of the Motion for Summary Judgment ("Defs. Br.") (ECF No. 143), at 8-9.)  In Opposition, Plaintiff argues that her second charge relates back to the one filed within the 300-day limitations period, and that the two are reasonably related.  (*See* Plaintiff's Br. in Opposition to Defendants' Motion ("Plf. Br.") (ECF No. 146), at 4-9.)

Title VII requires plaintiffs to first exhaust their administrative remedies before filing suit in federal court.  *See* 42 U.S.C. § 2000e-5(f)(3).  Exhaustion demands timely filing of charges with the EEOC and obtainment of a notice of right to sue.  *Id.*; *see also Williams v. N.Y. Hous. Auth.*, 458 F.3d 67, 69-70 (2d Cir. 2006).  Claims are timely filed with the EEOC if they are brought within 180 or 300 days of an alleged unlawful practice.  *See* 42 U.S.C. § 2000e-5(e)(1); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).  In states like New York that have their own equal employment agency, the time period is 300 days.  *Nat'l R.R. Passenger Corp.*, 536 U.S. at109; *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996). It is 180 in all others.  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 109; *Pearson v. Bd. of Ed.*, 499 F. Supp. 2d 575, 590 (S.D.N.Y. 2007).  Title VII exhaustion has been analogized by courts to statutes of limitations, and are thus not considered unwaivable jurisdictional prerequisites.  *See Hardaway v. Hartford Pub. Works Dep't*, 897 F.3d 486, 489 (2d Cir. 2018).

Plaintiff filed two charges with the EEOC. Her Initial Charge was filed on July 19, 2010 and the Second Charge on March 25, 2011. (Defs. 56.1, Exs. AA, BB.) Both Charges allege two distinct adverse employment actions: Plaintiff's non-receipt of the Fall '09 Fellowship and her December 2009 termination, though both identify only one date of discrimination – December 17, 2009. (*See id.*, Exs. AA, BB; *see also* Sapir Decl., Ex. 37.) The Court reviews each in turn.

### A.    Claims Arising From the Denial of the Fellowship for Fall 2009

Plaintiff makes no effort to refute Defendants' argument that claims arising from the Fall '09 Fellowship are untimely. Though unopposed, the Court will considered the merits in brief.

Plaintiff's Initial Charge was filed over 300 days after she received notice that she was denied the Fall '09 Fellowship; a claim on that basis cannot survive. To be timely, an EEOC charge must be filed within 300-days of the alleged unlawful practice, *see* 42 U.S.C. § 2000e-5(e)(1); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002),[11] which was triggered from the date on which Plaintiff was rejected for the Fellowship. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113; *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 79 (2d Cir. 2015); *Pearson v. Bd. of Educ.*, 499 F. Supp. 2d 575, 590 (S.D.N.Y. 2007). Moreover, the Court counts back from the date of the EEOC filing to ascertain what claims are timely and must dismiss all claims related to conduct that occurred 300 days before, unless an exception applies. *See Van Zant*, 80 F.3d at 712; *Carter v. New York City Dep't of Corr.*, 7 F. App'x 99, 103 (2d Cir. 2001)

---

[11] The statute requires a charge of discrimination be filed within 180 of the alleged unlawful conduct, but in cases where the state has its own equal employment agency at which claimant has already filed a charge, then the charge must be filed within 300 days of the alleged unlawful conduct. *Nat'l R.R. Passenger Corp.*, 536 U.S. at109; *Van Zant*, 80 F.3d at 712. There is no evidence in the record to demonstrate whether Plaintiff first filed her claims with the New York State Department of Human Rights ("NYSDHR"), but Defendants concede that the 300-day period was applicable. (*See* Defs. Br., at 8.) *See also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (parties agree that 300-day period applicable).

(summary order) (noting that the 300-day period "preclud[es] consideration of events that occurred more than 300 day prior to filing an administrative complaint").

Plaintiff was rejected for the Fellowship in May 2009 but filed her Initial Charge on July 19, 2010. (*See* Def. 56.1, Ex. AA.) Only claims related to alleged unlawful conduct that occurred after October 3, 2009 are actionable; the Fall '09 Fellowship rejection is untimely and no exception applies. *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004); *see also Pearson*, 499 F. Supp. 2d at 590 (noting that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation").[12] Defendants' Motion in this regard is granted.

## B. Race-Based Claims

Plaintiff acknowledges that the Initial Charge does not specify race discrimination, but argues that the Second Charge relates back to the first and/or the claims are reasonably related to one another. (*See* Plf. Br. at 4-8.)[13] This Court agrees.

---

[12] Plaintiff cannot avail herself of the continuing violation exception under these circumstances. "The continuing violation exception applies when there is evidence of an ongoing discriminatory policy or practice. . . ." *Van Zant*, 80 F.3d at 713. Primarily, Plaintiff makes no effort to oppose Defendants' contention, and does not argue in favor of the continuing violation exception. Even if Plaintiff had, the exception would not apply because her termination on December 17, 2009, the act she identified as the discriminatory act, is a discrete act, *see Nat'l R.R. Passenger Corp.*, 536 U.S. at 109, and there is no evidence that "an ongoing policy of discrimination" existed, *Patterson*, 375 F.3d at 220 (nevertheless distinguishing "discrete acts of discrimination" and finding that "the mere fact that an employee was dismissed within the statutory period cannot be used 'to pull in [a] time-barred discriminatory act'").

[13] To the extent that Plaintiff argues that her claims in the Second Charge are reasonably related to the Initial Charge, this Court disagrees, as that doctrine is inapplicable. The reasonably related doctrine arises in circumstances where the conduct before the court was not alleged in an EEOC charge. *See Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) ("[C]laims not raised in an EEOC complaint may still be a part of the complaint later filed in federal court 'if they are reasonably related to the claim filed with the agency.'"); *see also Ximines v. George Wingate High Sch.*, 516 F.3d 156, 158 (2d Cir. 2008) (age discrimination claim not in EEOC charge); *Williams v. N.Y. Hous. Auth.*, 458 F.3d 67, 71 (2d Cir. 2006) (applying reasonably related doctrine to circumstance where sex discrimination was not brought before EEOC at all); *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (noting that a court can hear Title VII claims "only if they have been included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge" (internal quotations omitted); *Holtz v. Rockefeller Co., Inc.*, 258 F.3d 62, 83 (2d Cir. 2001) (viewing claims "spelled out in two affidavits [Plaintiff] filed with the EEOC" under lens of charge amendment, not reasonably related doctrine). That is not the case here.

The EEOC permits amendments of a charge:

> to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. [Thus,] amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.

*See* 29 C.F.R. § 1601.12(b).

While "amendments that raise a new legal theory [typically] do not 'relate back' to an original charge of discrimination," *see Caravantes v. 53rd St. Partners, LLC*, No. 09-CV-7821(RPP), 2012 WL 96474, at *6 (S.D.N.Y. Jan. 12, 2012) (citing *Manning v. Chevron Chem. Co.*, 332 F.3d 874 (5th Cir. 2003)), where, as here, the amendment "do[es no] more than apply a different legal gloss to the same facts, *Bowen v. MTA N.Y.C. Transit Auth.*, No. 09-CV-3153, 2011 WL 7940367, at *8 (E.D.N.Y. Dec. 29, 2011), and there is little prejudice to defendants, *Caravantes*, 2012 WL 96474, at *6, relation back is appropriate.

Critically, Courts must ensure that Title VII charges are liberally construed, as "Title VII claimants should not be held to the precision of a code pleader," *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir. 1979); *see also Caravantes*, 2012 WL 96474, at *5 (technical readings of Title VII requirements are "particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process"); *Bowen*, 2011 WL 7940367, at * 7 (quoting *Sanchez v. Standard Brands, Inc.*¸431 F.2d 455, 562 (5th Cir. 1970) for proposition that while claimant "may have precise knowledge of the facts concerning the 'unfair thing' done to him, [he may] not be fully aware of the employer's motivation for perpetrating the 'unfair thing.'").

The Court is mindful that Plaintiff's Questionnaire reads predominantly of disability discrimination, and references race discrimination only insofar as it identifies the races of the individuals who were awarded the Fellowship, (*see* Sapir Decl., Ex. 37), and that Plaintiff is "Irish

Catholic", (*id.*) Nevertheless, her Second Charge asserts no new facts, or additional instances of discriminatory conduct; it merely provides an additional legal lens through which to consider the reasons for her termination. (*Compare* Defs. 56.1, Ex. AA and Sapir Decl., Ex. 37 *with* Defs. 56.1, Ex. BB.) Additionally, Defendants would not be prejudiced by this finding. The EEOC investigated the claims of racial discrimination, (*see* Sapir Decl., Ex. 39), and gave Defendants ample opportunity to defend the charges, (*Id.*) Indeed, the July 20th Determination states that "the Commission asked for [WCC's] evidence regarding poor student evaluations on two occasions but no information was provided", and that WCC "was also asked twice to provide the records of the individuals, both African-American women, who received the Fellowship but declined to produce them." (*See id.*) Defendants were on notice of the full extent of the charges against them.

Moreover, the Second Charge was filed during the EEOC's investigation and the EEOC was able to render a determination on the merits regarding both disability and race discrimination. One of the central purposes of a charge is to "place the EEOC on notice that someone . . . believes that an employer has violated the title." *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 68 (1984). Consequently, courts look to the actions of the EEOC for guidance on decisions regarding proper amendments, particularly noting whether the agency "did in fact investigate plaintiff's claims against" a defendant. *Manko v. Deutsche Bank*, No. 02-CV-10180(TPG), 2004 WL 574659, at *5 (S.D.N.Y. Mar. 22, 2004) (referring to finding by NYSDHR); *see Cole v. Cornell Co-op. Extension*, No. 03-CV-691S, 2006 WL 2711463, at * 4 (W.D.N.Y. Sept. 20, 2006) (in amendment analysis, considering fact that EEOC had already issued right to sue letter by time second charge was filed); *Shapiro v. AOE/Richo, Inc.*, No. 96-CV-7274(LMM), 1997 WL 452026, at *2 (S.D.N.Y. Aug. 7, 1997) (noting that second charge was filed after right to sue letter was issued); *Babcock v. Frank*, 729 F.Supp. 279, 284 (S.D.N.Y. 1990) (noting that the third charge was filed

during the pendency of the EEOC investigation). This Court is similarly persuaded that amendment is proper due to the EEOC's determination which: (1) assigned Plaintiff's Second Charge the same charge number as the Initial Charge; (2) identified it as an Amended Charge; and (3) considered both claims of disability and race discrimination in its analysis. (*See* Sapir Decl., Ex. 39; Defs. 56.1, Exs. AA, BB.)

In consideration of the foregoing, Plaintiff's claims of race discrimination are deemed administratively exhausted and are properly before this Court.

## II.    <u>McDonnell Douglas Standard</u>

Plaintiff's claims of disability and race discrimination, as well as retaliation, are subject to the *McDonnell Douglas* burden-shifting standard. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015); *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014); *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). Regardless of the claim, plaintiff bears the initial burden of demonstrating its prima facie case. *Cortes v. MTA New York Transit*, 802 F.3d 226, 231 (2d Cir. 2015); *Kirkland*, 760 F.3d at 225; *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (citing *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999)); *McMillan*, 711 F.3d at 125. Assuming Plaintiff demonstrates a prima facie case, a "presumption arises that the employer unlawfully discriminated," *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001), and the burden then "shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The "final and ultimate burden" then returns to Plaintiff to demonstrate that "defendant's reason is in fact pretext for unlawful discrimination." *See Abrams*, 764 F.3d at 251; *Cortes*, 802 F.3d at 231.

**A.     Title VII**

For racial discrimination, a plaintiff must "proffer evidence that (1) he belongs to a protected group; (2) he was qualified for his position; (3) his employer took an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an inference of race discrimination." *Kirkland*, 760 F.3d at 225; *Abrams*, 764 F.3d at 251-52. "[I]f the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rational is pretext, summary judgment dismissing the claim is appropriate." *Patterson*, 375 F.3d at 221.

1.     Prima Facie Case of Race Discrimination

Defendants' challenge Plaintiff's ability to demonstrate an adverse employment action and an inference of discrimination. (*See* Defs. Br. at 9-14.)

As to adverse employment action, Defendants contend that the non-receipt of the Fall 2009 Fellowship does not suffice. (*Id.* at 9-10.)  In light of this Court's finding that claims related to the Fall '09 Fellowship are time-barred, *see supra* I.A., the denial of her application cannot be an adverse employment action for purposes of her Title VII claims, *see Van Zant*, 80 F.3d at 712; *Sesay-Harrell v. NYC Dep't of Homeless Sevs.*, No. 12-CV-925(KPF), 2013 WL 6244158, at *16 (S.D.N.Y. Dec. 2, 2013) (noting that untimely allegations cannot be considered adverse employment action).[14]  Accordingly, the Court may only consider the denial of the Fall '09 Fellowship as "background evidence to support the actionable claims." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005).

Plaintiff nevertheless has suffered an adverse employment action; WCC's decision not to rehire her.  The parties do not dispute that such a decision amounts to Plaintiff's termination, an

---

[14] Due to this decision, the Court does not reach a determination on whether or not the denial of any fellowship can amount to adverse employment action under Title VII.

action well established as a "materially adverse change," *Hrisinko v. New York City Dep't of Educ.*, 369 F. App'x 232, 235 (2d Cir. 2010) (summary order), sufficient for purposes of a prima facie showing, *Sesay-Harrell*, 2013 WL 6244158, at *14. (quoting *Breyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).

In support of her argument that she has shown an inference of discrimination, Plaintiff points to the "racially tense and divisive environment" in the English Department at the time she was terminated and "an interest in providing Fellowships to racial and ethnic minorities." (*See* Plf. Br. at 12-13.) While Plaintiff's burden to present a prima facie case under the *McDonnell Douglas* framework is "minimal"; a "plaintiff's case must fail if she cannot carry this preliminary burden," *see Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 106 (S.D.N.Y. 2009) (quoting *Beyer*, 524 F.3d 160) (internal quotations omitted). Plaintiff's allegations, though thin, are sufficient.

The circumstances surrounding Plaintiff's rejection for the Fall '09 Fellowship and her subsequent submission of an application for the Spring 2010 Fellowship, the racially tense environment that existed in the English department after the firing of Mr. Downie, (Defs. Cntr. ¶110), and the treatment of other individuals not in Plaintiff's protected class, demonstrate an inference of discrimination. *See Russell v. New York Univ.*, No. 15-cv-2185(GHW), 2017 WL 3049534, at *32 (S.D.N.Y. July 17, 2017) (noting that courts look at, *inter alia*, "more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge" to ascertain whether there is an inference of discrimination). Shortly after Downie sued regarding his termination, a "special line" was created to advance the promotion of an African American adjunct who was promoted outside of usual channels when Plaintiff was not. (*Id.* ¶102.) Moreover, Plaintiff's version of events would demonstrate that she was originally

chosen to receive the Fall '09 Fellowship, but it was rescinded because she is not a person of color. (Sapir Decl., Ex. 1 at 254-55.) Finally, when Plaintiff applied for the fellowship a second time, after complaining of discrimination during a time where the English Department was already battling claims of racism, (Defs. Cntr. ¶116), she was terminated, and thus ineligible to receive the Fellowship at all.

2. Legitimate Non-Discriminatory Reason for Termination

Defendants have met their burden to articulate a non-discriminatory reason for Plaintiff's termination. At this stage of the *McDonnell Douglas* standard, the Court need not assess the credibility of the evidence proffered; it must decide whether defendants have "introduced evidence that, '*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason" for Plaintiff's dismissal. *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)). This standard is satisfied. Vent testified that Plaintiff was terminated because they had received student complaints that had been recurring for "three or four semesters" causing Vent to "reach[] a point where [she] said, this is it, we cannot continue this," and she "decided it was just too much of a liability, and [she] made the final decision not to rehire [Plaintiff]." (*See* Defs. 56.1, Ex. G, at 101, 133; Sapir Decl., Ex. 2, at 134.) Madden's December 21, 2009 email confirms that Plaintiff's termination related to Plaintiff's "history of problems" and her tendency to be "hostile with her students and her colleagues." (*See* Defs. 56.1, Ex. X.) Moreover, during his testimony, Madden discussed at least two instances in which students complained directly to him about Plaintiff's alleged hostility. (*See* Sapir Decl., Ex. 3, 25-30.)

In light of Defendants' legitimate non-discriminatory reason for Plaintiff's termination, "the presumption of discrimination drops out" and Plaintiff must now "present evidence from which a fact-finder could reasonably conclude that the employer's reason was pretextual and that

the real reason was discrimination." *Roge*, 257 F.3d at 168 (citing *Tarshis v. Riese Org.*, 211 F.3d 30 (2d Cir. 2000)) (internal quotations and alternations omitted).

3. Pretext

While Plaintiff's arguments call into question the veracity of Defendants' reason for her termination, they fall short of demonstrating that the real reason was race-related.

While "direct evidence of [discriminatory] intent" is rarely available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination," *Holcomb*, 521 F.3d at 137 (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1124 (2d Cir. 1994)) (internal quotations omitted), even in the discrimination context, a nonmoving party must submit "hard evidence", *see Shelton v. Trustees of Columbia Univ.*, 369 F. App'x 200, 201 (2d Cir. 2010) (summary order) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)), and is required to provide "more than conclusory allegations of discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *accord Pathare v. Klein*, 347 F. App'x 646, 647 (2d Cir. 2009) (summary order). Thus, to defeat summary judgment on the issue of pretext, Plaintiff must demonstrate "*both* that the reason was false, *and* that discrimination was the real reason." *Darboe v. Staples, Inc.*, 243 F. Supp. 2d 5, 15 (S.D.N.Y. 2003) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis added).

Where, as here a plaintiff offers no evidence that the discriminatory motive "was a factor" in decision on the adverse employment action, or only makes a "conclusory allegation[s] . . . unsupported by any actual evidence of discriminatory motive," he cannot defeat summary judgment. *Shub v. Westchester Cmty. Coll.*, 556 F. Supp. 2d 227, 256 (S.D.N.Y. 2008); *see also Diaz v. City Univ. of New York*, No. 13-CV-2038(PAC)(GWG), 2017 WL 3088394, at

*14 (S.D.N.Y. July 20, 2017) (no genuine issues where plaintiff offers "no non-speculative basis on which to reach" a conclusion that the reason advanced by defendants is only pretext).

Plaintiff's arguments consist predominantly of facts surrounding the rejection of her application for the Fall '09 Fellowship and how such actions could have been racially motivated. With regard to her termination, however, Plaintiff merely strings together a number of conclusory statements and asks this Court to jump leaps in logic, unsupported by the record, because she was terminated during a time when the English Department was facing backlash for denying tenure to Mr. Downie. Plaintiff's sole argument tying her termination to race is that "the only thing that happened . . . is Plaintiff's application for the [Spring '10] Fellowship came up for review and the college wanted to ensure that Plaintiff, a white teacher, did not get appointed in favor of a black applicant," and that the "only way to ensure this was to deny her a teaching assignment for the next semester and disqualify her from consideration." (*See* Plf. Br. at 16.) Such contentions are not supported by fact. This is simply too attenuated an argument to withstand muster; at best such an argument would only demonstrate that Plaintiff was terminated to avoid considering her for the Fellowship or because she was making waves regarding the Fall 09' Fellowship decision, not because of her race. [15] Defendants are entitled to summary judgment on this claim.

**B.    ADA**

Defendants argue that Plaintiff's ADA claim fails because she cannot establish a prima face case for disability discrimination. (*See* Defs. Br. at 16-18.) This Court agrees.

A prima facie case of disability discrimination requires a plaintiff to demonstrate, by a preponderance of the evidence, that: (1) his employer is subject to the ADA; (2) he was disabled

---

[15] Plaintiff correctly points out that "[i]t is hard to reconcile that, as of April 2009, Plaintiff was an effective teacher of Basic Writing, who did the best for her students and had an excellent work ethic with an alleged 'history of problems' resulting in the termination of her employment." (*See* Plf. Br. at 15.) Nevertheless, there is no connection between this inconsistency in Dr. Vent's position and a showing that her termination was motivated by race.

within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Conclusory assertions are insufficient on a motion for summary judgment. *See Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 16 (2d Cir. 2011) (summary order); *see also Nieblas-Love v. New York Hous. Auth.*, 165 F. Supp. 3d 51, 66 (S.D.N.Y. 2016) (noting that "it is well established that a plaintiff must do more than 'cite to their mistreatment and ask the court to conclude that it must have been related to" discrimination). Here, the parties only dispute whether Plaintiff's termination was due to her disability.

Plaintiff's claim for ADA discrimination is based entirely on conclusory allegations and indirect requests that this Court conclude that her termination was related to her disability. Indeed, Plaintiff fails to even argue her disability claim separately; it is merely lumped into her arguments regarding her race discrimination claims. (*See* Plf. Br at 9-21.) To be sure, the following constitutes the only statements Plaintiff makes in support of her ADA claims: (1) in a heading, she states that "the persons selected from the English Department were all black or ethnic minorities who were not disabled", (*see* Plf. Br. at 12 ); (2) she states that "even a cursory review of the circumstances surrounding the decision to terminate her employment raises questions of fact whether her race, disability or complaints actually motivated the decision rather than supposed concerns about her performance," (*id.* at 14), but provides not citations in support thereof; and (3) she states that the "systematic deviation from [] rules for the benefit of minorities certainly raises questions of fact" regarding racial and disability motivations (*id.* at 18). Plaintiff's conclusory assertions fail to do more than "cite to their mistreatment and ask [this Court] to conclude that it must have been related to" her disability. *Nieblas-Love*, 165 F. Supp. 3d at 66.

There is only one incident reflected in the record related Plaintiff's disability. In November of 2009, a mere month before Plaintiff was terminated, two students made disparaging remarks about her disability. (*See* Defs. 56.1, Ex. I.) Plaintiff drafted an incident report and indicated that the students were permitted to return to class after submitting letters of apology. (*Id.*) On December 12, 2009, Kevin Slavin, one of the deans at WCC, responded to Plaintiff's email and inquired into whether the students had apologized, noting that if they had not he "will see them again." (*Id.*) This evidence tends to dispute any contention that disability was a factor in her termination, and considered in conjunction with Plaintiff's abject failure to produce one iota of evidence to support a claim that she was discriminated against *because of her disability*, this Court finds that her ADA claim cannot survive summary judgment. Defendants' Motion on the ADA claim is granted.

## C. Retaliation[16]

Defendants challenge Plaintiff's retaliation claim because she never "'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' prior to [WCC's] determination" to fire her. (*See* Defs. Br. at 21 (quoting 42 U.S.C. § 2000e-3(a)).) Defendants otherwise argue that Plaintiff has failed to demonstrate a causal connection between any alleged protected activity and her termination. (*Id.*) This Court disagrees.

As with the substantive Title VII and ADA claims for discrimination, retaliation claims are subject to the *McDonnell Douglas* standard. *Ya-Chen Chen*, 805 F.3d at 70. A prima facie case for retaliation requires a showing that Plaintiff "participated in a protected activity, suffered an

---

[16] This Court's dismissal of Plaintiff's discrimination claims under Title VII and the ADA does not preclude Plaintiff from prevailing on a retaliation claim. *See Grozynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 n.8 (2d Cir. 2010) (noting that employee "need not establish that the conduct she opposed was in fact a violation of Title VII"); *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 454, 473 (S.D.N.Y. 2011) (noting that a "plaintiff need only 'have a good faith, reasonable belief that he was opposing an employment practice made unlawful . . . .' [h]e need not prove the underlying discrimination allegations") (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006)).

adverse employment action, and that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Id.* (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)) (internal quotations omitted). Under the *McDonnell Douglas* standard, if Plaintiff makes a prima facie showing and defendant then provides a legitimate non-retaliatory reason for the adverse employment action, a plaintiff then "must prove 'that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

    1.  <u>Prima Facie Case</u>

Defendants first argue that verbal complaints are insufficient for protected activity (Defs. Br. at 20); they miss the mark. While it is true that protected activity is shown if plaintiff "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," in response to an alleged unlawful employment practice, *see* 42 U.S.C. § 2000e-3(a); *see also* 42 U.S.C. § 12203(a), it is not the only form of protected activity. Indeed, a plaintiff has engaged in protected activity where he "has opposed any practice made an unlawful employment practice by this subchapter." *Id.* The statute does not, however, define what type of conduct constitutes opposition. *See Smith v. St. Luke's Roosevelt Hosp.*, No. 08-CV-4710(GBD)(AJP), 2009 WL 2447754, at *20 (S.D.N.Y. Aug. 11, 2009) (quoting *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)), *report and recommendation adopted by* 2009 WL 2878093.

The Supreme Court made clear that "[t]he term 'oppose,' being left undefined, carries its ordinary meaning . . . : '[t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand . . . ." *Crawford*, 555 U.S. at 276. Indeed, "'[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that

communication' virtually always 'constitutes the employee's *opposition* to the activity.'" *Id.* Consequently, even informal complaints to management constitute opposition for purposes of demonstrating protected activity. *Amin v. Akzo Nobel Chems., Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) (summary order); *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014); *Smith*, 2009 WL 2447754, at *20. Consequently, Plaintiff's alleged complaints to Vent are sufficient for purposes of this prong.[17]

Defendants' argument that any such complaints are insufficient because Vent does not recall them, (*see* Defs. Br. at 21), is likewise unavailing. The existence of such testimony does little to dissuade this Court that Plaintiff has raised a triable issues of fact for two reasons: (1) Vent's testimony is not a direct contradiction of Plaintiff's;[18] and (2) any dispute amounts to a credibility determination, which this Court cannot make. Moreover, while Vent equivocates on whether she can recall these events, she also contradicts herself by testifying that Plaintiff was "harping on who got a job, who didn't; harping on conspiracies about who's trying to keep her from getting this fellowship." (*See* Sapir Decl., Ex. 2 at 212.) A reasonable juror could find that such testimony implies that Plaintiff was repeatedly complaining to Vent, such that it began to irritate her. These contradictions must be resolved through a credibility determination, which is

---

[17] To the extent Plaintiff claims her complaints to Vent during the December 17, 2009 telephone conversation constitute protected activity, she is incorrect. By Plaintiff's own admission, the termination was communicated to her on December 17, 2009, by Vent, causing her to claim it was because of discrimination; indeed, in writing Plaintiff indicated that she had been fired during that phone call. (*See* Defs. 56.1, Ex. U.) Consequently, Plaintiff's complaints to Vent regarding discrimination during that call cannot suffice for retaliation, as they did not occur before her termination. *See Hausdorf v. N.Y.C. Dep't of Educ.*, (quoting *Nakis v. Potter*, 422 F. Supp. 2d 398, 423 (S.D.N.Y. 2006) for proposition that no causal connection where adverse action "predated, rather than followed" the protected activity).

[18] In fact, Defendants' cherry-pick Vent's testimony in an effort to demonstrate no genuine issue of material fact exists. In reality, Vent, responding to whether or not Plaintiff complained to her that she was rejected due to discrimination, also testified that it "sound[ed] like something [Plaintiff] might have said, but I don't recall that." (*See* Sapir Decl., Ex. 2 at 312.)

within the sole province of the jury. *See Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).

Plaintiff has also demonstrated a causal connection between the protected activity and her termination. "Title VII is violated if a retaliatory motive played a part in the adverse employment action even if it was not the sole cause." *Summer v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986)). Even if the employer had "objectively valid grounds for the discharge," Title VII is nonetheless violated if "the employer was motivated by retaliatory animus." *Id.* (citing *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)). Plaintiffs may prove causal connection "either through direct evidence of a retaliatory animus or indirectly through evidence, for example, of the close proximity in time of the two events." *Dayes v. Pace Univ.*, 2 F. App'x 204, 208 (2d Cir. 2001) (summary order) (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff is arguably unable to root her argument for causal connection in temporal proximity. Assuming that Plaintiff complained only once to Vent in May or June of 2009 that her non-receipt of the Fall '09 Fellowship was due to discrimination, six months passed between that complaint and her termination; too long a gap to be considered "very closely associated to support an inference of retaliation," *see Giles v. NBC Universal, Inc.*, No. 10-CV-7461(DAB), 2011 WL 4376469, at *3 (S.D.N.Y. Sept. 20, 2011) (alternations in original omitted), although at least one court has found six months to be within the realm of timeframes considered close enough, *see Barry v. N.Y.C. Police Dep't*, No. 01-CV-10627(CBM), 2004 WL 758299, at *8 (S.D.N.Y. Apr. 7, 2004) (finding 8 months close enough); *but see Jimenez v. City of New York*, 605 F. Supp. 2d

485, 528 (S.D.N.Y. 2009) (noting that anything more than three months is typically insufficient). Temporal proximity, however, is not viewed in a vacuum.

Clinching Plaintiff's ability to demonstrate a causal connection is her direct evidence of retaliatory animus. On October 29, 2009, the same day that Plaintiff submitted her application for consideration for the Spring 2010 fellowship, Ostman and Vent exchanged emails about Plaintiff. Ostman asked Madden and Vent if they could "discuss this together before [they] respond[ed]" and noted that Plaintiff's application was "quite long." (*See* Sapir Decl., Ex. 30.) In response, Vent wrote "I don't want to sabotage her application, but I'm getting a little tired of this after hearing her story over and over." (*Id.*) Considering the fact that this email was in direct response to receiving Plaintiff's application for Spring 2010 and Plaintiff's complaints to Vent that she was denied the Fall '09 Fellowship due to discrimination, a reasonable juror could infer that the story that Vent was tired of hearing "over and over" was Plaintiff's complaints that she was discriminated against.

In light of both the direct and indirect evidence of retaliatory animus presented by Plaintiff, she has presented sufficient evidence to defeat summary judgment on her retaliation claim. *See Barry*, 2004 WL 758299, at *9 (denying motion where Plaintiff provided both direct and indirect evidence of retaliatory animus).

This Court has already determined, *supra* II.A.2., that Defendants have proffered a legitimate non-discriminatory reason for terminating Plaintiff which can be considered a legitimate non-retaliatory reason for terminating Plaintiff as well.

2. Pretext for Retaliation

At the pretext stage, a plaintiff "may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer

explanations, to defeat summary judgment." *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 403 (S.D.N.Y. 2014) (quoting *Zann Kwan v. Andalez Grp. LLC*, 737 F.3d 834 (2d Cir. 2013)). The pretext stage "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846. A Plaintiff can meet this burden by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in employer's proffered legitimate, non-retaliatory reasons for its action." *Id.*

First, Plaintiff raises triable issues of fact that the proffered reason is false. The purported reasoning for Plaintiff's termination is that she had received too many student and colleague complaints and it was easier to "cut ties now" than allow Plaintiff to get on a tenure track. (*See* Defs. 56.1, Ex. G at 133; Ex. X.) The following facts, among others, call that reasoning into question: (1) while Vent testified that Madden received complaints about Plaintiff "every single semester", Madden testified that he had specific recollection of only two complaints, and the others were just general from his colleagues that students were complaining, (*compare* Defs. 56.1, Ex. G at 133 *with* Sapir Decl., Ex. 3 at 36); (2) Vent testified that she personally had never received complaints from students about Plaintiff but Madden testified that Vent did indeed receive student complaints which she mentioned to him, (Sapir. Decl., Ex. 2 at 134 *with* Ex. 3 at 37); (3) the two complaints Madden did describe, he believed were resolved, as he had not heard back from the students after he advised them to discuss their complaints with Plaintiff directly, (Ex. 3 at 30, 33); (4) Madden had no recollection of ever contacting Plaintiff by email, or otherwise, regarding any complaints, (*id.* at 19), and (5) though Plaintiff's "abrasive" personality was cited as a reason for her termination, Ostman admitted that she also found Plaintiff to be kind and noted that she

assumed her abrasive qualities to be linked to Plaintiff's Bronx roots, (Sapir Decl., Ex. 4 at 30.)

This evidence of inconsistencies and contradictions is sufficient to demonstrate issues of fact.

Plaintiff has also raised triable issues of fact regarding pretext for retaliation. On the one hand, Vent testified that her opinion of Plaintiff began to sour after hearing so many complaints semester after semester, (*see* Defs. 56.1, Ex. G at 133), that she only allowed Plaintiff to use a letter previously written by her in 2006 for Plaintiff's Fall '09 application because she did not really support her at that point, (*see* Sapir Decl., Ex. 2 at 193), and by that time she believed Plaintiff was *not* an effective teacher of Basic Writing and *did not* do what was best for her students. (*See* Plf. Resp. ¶¶79-80.) Vent's April 2009 email (offered as evidence of a triable issue of fact) directly contradicts Vent's testimony, as it was written during the time Vent testified she had no longer supported Plaintiff. In an apparent endorsement of Plaintiff, Vent wrote:

> Maureen Hurson[19] *is an effective teacher of Basic Writing*. She provides students with structure, basic skills, and a great deal of practice writing. This means a great deal of work for her, *but she does what is best for students*. As a disable person, she is a good role model for her cases. This fact, along with her work ethic, makes her a strong candidate for the fellowship.

(Sapir Decl., Ex. 23 (emphasis added).) The following semester, after Plaintiff submitted her Spring 2010 application, Vent objected to Plaintiff's candidacy for the Fellowship by indicating she was tired of hearing Plaintiff's "story." (Sapir Decl., Ex. 30.) Shortly thereafter, Plaintiff was terminated.

The direct contradictions and inconsistencies in Vent's account of when she did and did not support Plaintiff demonstrate an issue of credibility this Court is not permitted to resolve on a motion for summary judgment. As the individual who claimed to have made the final decision on Plaintiff's employment, (*see* Plf. Resp. ¶81), inconsistencies in her opinion of Plaintiff leading up

---

[19] Plaintiff goes by both Mary and Maureen.

to the decision to terminate her, and her statements that she was tired of hearing Plaintiff's story in the month's leading to Plaintiff's termination creates issues of fact regarding Vent's true motivation for Plaintiff's dismissal, that are material and must be resolved at trial.[20] Defendants' Motion for summary judgment on retaliation is denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED in part and DENIED in part. Summary judgment is granted in sDefendants' favor on the claims of race and disability discrimination under Title VII and the ADA. Nevertheless, Plaintiff has raised genuine issues of material fact as to whether her termination is attributable to retaliatory motives. The Clerk of the Court is respectfully requested to terminate the motion a ECF No. 141. The parties are directed to appear this honorable Court on July 13, 2018 at 11:30 a.m. for a pretrial conference.

Dated:   June 20, 2018                     SO ORDERED:
        White Plains, New York

                                              NELSON S. ROMÁN
                                     United States District Judge

---

[20] While Ostman and Madden both contributed to the decision to terminate Plaintiff, by Vent's own admission, she made the final call. (*See* Plf. Resp. ¶81.)